IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**Black Samsung Cell Phone, assigned call number (406) 564-7722, IMEI 35003381399668.** | **MJ 23- 96 -GF-JTJ** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Monte Shaide, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and am currently assigned to the Missoula Resident Agency in Missoula, Montana.  I have been employed as an SA for over 25 years, and in this time, I have had extensive training and experience in conducting violent-crime related investigations, including criminal enterprise investigations.  For over nine years, I served on the Pierce County Violent Crime Task Force in Tacoma, Washington, and the Puget Sound Task Force in Seattle, Washington.  For over 12 years, I was a member of the FBI Montana Regional Violent Crime Task Force (MRVCTF), which specializes in targeting habitual violent offenders, dismantling violent criminal enterprises, and tracking fugitives.  From 2019-2020, I served as a Supervisory Special Agent for the National Tactical Training Unit in Quantico,

Virginia, providing national-level program management of the FBI's Field Special Weapons and Tactics (SWAT) program and SWAT sub-programs. Management included certification of SWAT Agents and core skills, specialized training of the SWAT teams, and planning, assistance, and oversight during multiple-office SWAT deployments involving high-risk warrant service, tactical surveillance interdiction, and hostage rescue. In September of 2020, I returned to the Missoula Resident Agency to resume my duties as an SA assigned to the MRVCTF.

2. I am assigned to the case summarized in this affidavit, and the information contained in this affidavit is based on my own observation, training, and experience, and, where noted, information provided to me by other law enforcement officers. I have not included all the facts known to me, but rather only those facts necessary to establish probable cause.

3. This affidavit is in support of a search warrant application for the cell phone of Paul J. Valenzuela Sr. relating to Threats against a Federal Official, Prohibited Person in Possession of Ammunition, Assault with a Dangerous Weapon, and Conspiracy to Distribute Methamphetamine.

## PROPERTY TO BE SEARCHED

4.      This affidavit is made in support of an application for a search warrant to search the following electronic media:

Black Samsung Cell Phone black Samsung Cell Phone with a cracked screen, assigned call number (406) 564-7722, IMEI 35003381399668.

## PROBABLE CAUSE

5.      On August 14, 2023, Paul J. Valenzuela Sr. was arrested by an FBI SWAT Team by a federal complaint and arrest warrant signed by U.S. Magistrate Judge John Johnston for the crimes of Felon in Possession of a Firearm, in violation 18 U.S.C. § 922(g)(1), and Threats to a Federal Officer, in violation of 18 U.S.C. § 115(1)(a)(B), at Valenzuela's residence in Great Falls, Montana.  The first charge stemmed from numerous confidential sources that provided information to FBI SA Alex Prostko and other law enforcement officers on the Blackfeet Reservation who witnessed Valenzuela threaten individuals while in possession of a firearm and also possession of a firearm while engaged in illicit drug activity.  A FBI NCIC report obtained by law enforcement indicated Valenzuela had six felony convictions in Washington State between 1986 and 2017 for Burglary, Theft, Attempt to Elude, Rendering Criminal Assistance, and two counts of Unlawful Possession of a Firearm.  Valenzuela was also arrested on other felony crimes and was convicted for misdemeanor assault and domestic violence.

6.      The second charge stemmed from two text messages sent from Valenzuela to FBI SA Alex Prostko on August 7, 2023.  Valenzuela sent both messages to SA Prostko's work cell phone from Valenzuela's cell phone (406) 564-7722.  Valenzuela was upset at SA Prostko because SA Prostko continued to interview witnesses regarding Valenzuela's criminal activity, including an assault of John Doe.  The messages are listed below:



7.      After Valenzuela's arrest, I showed Valenzuela a copy of the arrest warrant prior to transporting Valenzuela to the Cascade County Correctional

Center on the above-mentioned federal charges. I recorded the conversation as I asked Valenzuela if he wanted to speak with me regarding the specific charges. I told Valenzuela I would take him to an interview room and advise him of his *Miranda* rights. Valenzuela stated he did not want to speak with me unless I could get him out of the "cuffs," referring to the charges. I told Valenzuela that was not going to happen. Despite not wanting to sit down and have his *Miranda* rights read to him, Valenzuela continued to talk to me. Valenzuela stated SA Prostko could have called him, sat down, and talked man to man. Valenzuela was "pissed off" because SA Prostko went behind Valenzuela's back and was asking questions about Valenzuela. Valenzuela stated SA Prostko should have stopped talking to "fucktards" on the street and went directly to Valenzuela if SA Prostko wanted information. Valenzuela stated he did not threaten SA Prostko and Valenzuela's text was taken out of context. Valenzuela was mad at SA Prostko because he was asking "retards" in Browning for information, and they would say anything to avoid jail time.

    8.    Valenzuela stated he exploits his criminal reputation to make people fear him. Valenzuela spoke about "Dobbers," who used to reside with Valenzuela's daughter, Cynthia. I asked Valenzuela if Dobbers was his son-in-law. Valenzuela stated that Dobbers was a "wife beater" and not his son-in-law. Valenzuela further stated, "He is no good and that's why he ain't got no jaw no

more and teeth in front of his grill. All that shit happens for a reason. That's why Cynthia had to get out of there."

9. Valenzuela stated he did not threaten SA Prostko, he pretty much threatened himself. Valenzuela further stated, "I'm not going back to the cage, as you (FBI) will have to come at me full force. Either death for me or freedom. You caught me looking as I was sleeping good." Valenzuela then changed his demeanor and wanted me to tell SA Prostko that he did not mean it, referring to the threatening messages. Valenzuela also stated that he used to be involved in methamphetamine, but it was all about the money.

10. After Valenzuela was placed into custody, FBI Agents searched Valenzuela's residence at 710 7th Avenue North in Great Falls, Montana, pursuant to a search warrant authorized by U.S. Magistrate Judge Johnston. The following items were seized as evidence pursuant to the search warrant:

- 60 rounds of various pistol and rifle ammunition;
- A machete;
- A pistol laser sight;
- Two cell phones; and,
- A computer tablet.

One of the cell phones was identified as Valenzuela's cell phone and described as a black Samsung with a cracked screen, assigned call number (406) 564-7722, IMEI 35003381399668.

11.   On August 23, 2023, Valenzuela was indicted by a Federal Grand Jury for the following:

- Count 1: Impeding a Federal Investigation by a Federal Agent Due to a Threat, in violation of 18 U.S.C. § 115(a)(1)(B), (b)(4);

- Count 2: Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1153(a), 113(a)(3), and 2;

- Count 3: Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 1153(a), 113(a)(6), and 2; and,

- Count 4: Prohibited Person in Possession of Ammunition, a violation of 18 U.S.C. § 922(g)(1).

12.   The assault charges, Counts 2 and 3, stem from an incident that occurred on or about the third week of April of 2023.  Valenzuela, along with his son, Paul Valenzuela Jr., went to the home of John Doe, which is on the Blackfeet Indian Reservation.  Valenzuela and his son assaulted Doe.  Valenzuela struck Doe with a baseball bat multiple times, which broke Doe's jaw and fractured his ribs.  Doe was admitted to the Indian Health Center in Browning for his injuries.  The injuries were consistent with Doe's statement regarding the assault.

13.   Law enforcement also had multiple confidential sources identifying Valenzuela as a source of supply for drugs.  For example, on October 18, 2019, a

confidential source (CS1), who wished to remain anonymous for reasons of their own personal safety, was interviewed per a proffer by SA Prostko and Drug Enforcement Agent (DEA) SA Bill Murphy at the Cascade County Correctional Facility.  CS1 had been arrested on federal charges for Distribution of Methamphetamine.  CS1, in the presence of an attorney, advised that Valenzuela was CS1's primary source of supply for methamphetamine.  Valenzuela told CS1 that if CS1 or anyone else spoke to anyone or law enforcement about his involvement, Valenzuela would make them disappear.

14.     On May 1, 2020, a confidential source (CS2), who wished to remain anonymous for their own personal safety, was interviewed by SA Prostko and FBI Task Force Officer (TFO) Josh Simonds at the Bureau of Indian Affairs (BIA) Browning Correctional Facility.  After being advised of their *Miranda* rights, CS2 provided the following information in an audio-recorded interview.  CS2 stated Valenzuela was involved in the sale of large quantities of methamphetamine.  On or around April 2020, CS2 went to the residence of Valenzuela and Clay Flammond in Browning, Montana.  Valenzuela and Clay Flammond lived together and were known to distribute methamphetamine.  While at their residence, Valenzuela produced two large bricks of methamphetamine, described by CS2 as being approximately one kilogram in weight each.  Valenzuela kept the methamphetamine bricks on his person in a backpack.  CS2 purchased one gram of

methamphetamine from Valenzuela for approximately $100. During the transaction, Valenzuela was in possession of a single shot sawed-off shotgun and an AK-47 assault rifle. CS2 opined that Valenzuela was always armed during a transaction to prevent anyone from trying to rob him. CS2 has also observed Valenzuela with a 9mm handgun and a Derringer revolver on other occasions.

15. On June 9, 2020, BLES responded to the Glacier Family Foods store in Browning regarding a report that two males were pointing guns at each other. Further investigation, which included interviews of witnesses and a review of surveillance video, revealed Valenzuela and an unidentified younger male were armed with handguns. Valenzuela was driving a white Chevy pickup truck when he pulled up into the store parking lot, next to the gas pumps. Valenzuela and the younger male exited from Valenzuela's vehicle. Valenzuela had a handgun tucked into the front waistband of his pants that was visible by witnesses and video. Valenzuela and the younger male, who was also armed, approached Drew Gallineaux, who was inside a black Dodge Avenger. The younger male brandished a chrome handgun by pulling the handgun from his front waistband and flashed it at Gallineaux. One witness overheard a verbal altercation, in which Valenzuela or the younger male stated to Gallineaux, "He better watch it homie!" A report of the incident was documented and provided to SA Prostko.

16. On December 10, 2020, a confidential source (CS3), who wished to remain anonymous for their own personal safety, was interviewed by FBI SA Aaron Christensen and FBI SA Jonathan Cusak in Billings, Montana. CS3 agreed to provide the following information in an audio-recorded interview. CS3 heard that Valenzuela had killed an individual in Washington State over a drug deal a number of years ago. According to CS3, Valenzuela was involved in trafficking methamphetamine and traveled to Washington State to purchase methamphetamine from a source of supply over the last year. CS3 also stated Valenzuela would provide methamphetamine to Clay Flammond and other individuals in Browning. CS3 described Valenzuela as extremely volatile, as CS3 was concerned of being "pistol whipped" by Valenzuela if CS3 ever spoke to law enforcement regarding Valenzuela. CS3 observed Valenzuela in possession of a handgun at all times. CS3 described the handgun as a silver Browning 9mm with a brown handle.

17. On June 28, 2021, a confidential source (CS4), who wished to remain anonymous for their own personal safety, volunteered the following information during an interview with SA Prostko, SA Murphy, FBI SA Jake Caudle, and FBI SA Joe Anders at the FBI Shelby RA. CS4, who is a long-time associate of Valenzuela, stated Valenzuela was obtaining approximately two ounces of methamphetamine per week from 2012 through 2020. Valenzuela would travel from Browning to Tacoma, Washington, to meet his source of supply. CS4

traveled with Valenzuela over that time period but never met Valenzuela's methamphetamine source. Valenzuela would return to Browning to distribute the methamphetamine. CS4 stated Valenzuela always carried a 9mm handgun and would brandish it during drug deals so individuals would know not to mess with him.

18. On July 9, 2021, a confidential source (CS5), who wished to remain anonymous for their own personal safety, was interviewed at the Toole County Sheriff's Office by SA Prostko and Toole County Sheriff's Deputy Josh Ulayki. CS5 provided the following information in an audio-recorded interview. Approximately four months ago, CS5 observed two firearms in Valenzuela's residence in Browning. The firearms were described by CS5 as a 9mm handgun, and an AK-47 assault rifle. CS5 stated Valenzuela previously kept the handgun and the assault rifle in his vehicle. CS5 also stated Valenzuela provided them with small amounts of methamphetamine in the past.

19. On November 18, 2021, a confidential source (CS6), who wished to remain anonymous for their own personal safety, was interviewed by SA Prostko and DEA SA Kirk Lemmon in Browning, Montana. CS6 provided the following information in an audio-recorded interview. In 2016, Valenzuela pulled up next to CS6 in Browning, brandished a revolver and pointed it directly at CS6. Valenzuela told CS6 he was taking over the town, referring to being the main drug distributor

in Browning. CS6 stated Valenzuela took over the town after his comment and was the main supplier of methamphetamine.

20. On December 6, 2021, Valenzuela was contacted and interviewed in Great Falls, Montana, by SA Prostko and SA Caudle regarding Valenzuela's involvement or potential knowledge of the disappearance of Ashley Loring Heavy Runner. After being advised of the identity of the interviewing Agents, Valenzuela provided the following information in an audio-recorded interview. Valenzuela denied having any specific knowledge regarding the whereabouts of Loring Heavy Runner. Valenzuela admitted that he dabbled in dope every once in a while, but stopped dealing dope.

21. Based on my training and experience, I know that drug dealers and those who engage in violent crimes use their phones to perpetuate their criminal activity, especially if those individuals are travelling out of state to purchase drugs for redistribution. These text messages and communications remain on a phone unless deleted by the user. Additionally, I know through my training and experience that drug dealers use their phones to coordinate drug deals, meetings, distribution of drugs to others, and to aid in the acquisition of firearms and ammunition for protection during the commission of these crimes. When committing these crimes, including violent crimes, individuals carry their phones with them, meaning the location of the user can be identified based on the phone.

**TECHNICAL TERMS**

22.     Based on my training and experience, I use the following technical terms to convey the following meanings: wireless telephone, cellular phone, or smartphone.  A wireless telephone (or smartphone, mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet using a browser or other applications.  Wireless telephones may also include Global Positioning System ("GPS") technology for determining location of the device.

23.     Based on my training, experience, and research, I know that the device listed in Attachment A, has capabilities that allows it to serve as wireless

telephone or smartphone, digital camera, portable media player, GPS navigation device, and a file storage device.  In my training and experience, examining data stored on a cellular device can uncover, among other things, evidence that reveals or suggests who possessed the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices.  This information can sometimes be recovered with forensic tools even if the information is deleted.

25. Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic evidence is on the device listed in Attachment A, because:

   a. Data on storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file.

b.	Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.	A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.	The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.	Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## CONCLUSION

26. Based on the forgoing, I believe there is probable cause to conclude Valenzuela's cell phone, described as black Samsung cell phone, with assigned call number (406) 564-7722, contains evidence of federal crimes, including, but not limited to, Impeding a Federal Investigation by a Federal Agent Due to Threat, in violation of 18 U.S.C. § 115(a)(1)(B), (b)(4), Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. § 846, and Prohibited Person in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).

27. It is my belief that there is probable cause to believe that a search of the item described in Attachment A will provide evidence of the above crimes, including, but not limited to, location information and records or communications involved in the commission of the above crimes, as provided in Attachment B.

Respectfully submitted,

*Monte Shaide*
Monte Shaide
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to me consistent with Rule 4.1 on this 11th day of October, 2023.

*John Johnston*
John Johnston
United States Magistrate Judge